RANDOLPH, Presiding Justice,
specially concurring:
¶ 137. I fully concur with the majority opinion but choose to write separately to address the Neuschatz proffer and its lack of relevance and reliability, and the alleged Batson violation.
I. Whether the trial court abused its discretion and erred as a matter of law in excluding the scientifically based testimony of a psychologist with expertise in memory and cognition concerning the reliability of eyewitness identification procedures and testimony in this case.[4]
¶ 138. “Expert opinion testimony not tied to the individual whose behavior is at issue and not stated with reasonable certainty flunks the test.” West v. State, 553 So.2d 8, 21 (Miss.1989) (emphasis added). In today’s case, we must decide who “flunked the test.” Is it Neuschatz, who failed to proffer an opinion with a reasonable degree of certainty, and who further failed to support his opinions with fact-specific testimony that “fit”[5] the facts of this case? Or was it the trial judge who excluded Neuschatz’s proffer in a case with substantial direct and circumstantial evidence, supported by substantial corroborative evidence, consistent with the hold- *326 tags of a majority of all federal and state courts that have considered the issue?[6] Did the trial judge act within his discretion in excluding Neuschatz’s problematic, general testimony, that did not “fit” the facts of the case sub judice? See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 591, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993). Generalized testimony on the assumed deficiencies of everyman eyewitness testimony, such as that proffered by Neus-chatz, can lead to confusion, and, when not based on facts of a specific case, can mislead the jury. Furthermore, Neuschatz’s generalized proffer was contrary to actual evidence adduced at trial.
¶ 139. Other trial and appellate courts from other jurisdictions have rejected and excluded nearly identical testimony from Neuschatz himself. This trial court rejected Neuschatz’s proffered testimony for some of the same reasons.
A. Recent courts have excluded Neuschatz.
¶ 140. Neuschatz recently has “flunked the test” to offer similar testimony in Georgia, Maryland, and Minnesota, in both federal and state courts, trial and appellate. Neuschatz recently was excluded in Georgia trial and appellate courts. Frazier v. State, 305 Ga.App. 274, 699 S.E.2d 747, 750 (2010). A special concurrence perhaps stated it best: “the admission of [Neuschatz’s testimony] is within the sound discretion of the trial court, whose discretion will not be disturbed on appeal absent clear abuse. I also wish to point out that such expert testimony is problematic and generally unnecessary.” Frazier, 699 S.E.2d at 752 (Mikell, J., concurring) (emphasis added). “An appellate court should not feign allegiance to the rule that a matter is within the trial court’s sound discretion and then find an abuse of discretion whenever it disagrees with the trial judge’s decision.” Id. (emphasis added). The Frazier court wrote that the victim stated that “she looked him ‘right in the face’ during the incident” and that the victim’s description of the gender, race, height, hairstyle, and pants of the suspect all matched the defendant, obviating the need for Neuschatz’s testimony.[7] Id. at 749-750.
¶ 141. Likewise, the Fourth Circuit upheld the exclusion of Neuschatz’s proposed testimony by a U.S. district court in Maryland. In U.S. v. Davis, 690 F.3d 226, 257 (4th Cir.2012), the court stated:
Davis sought to introduce the testimony of Dr. Jeffrey Neuschatz as an expert in eyewitness identifications. According to his expert witness report, Dr. Neuschatz intended to testify that the lineup procedure used with Ms. Jessamy did not meet the good practices guidelines of the American Psychology-Law Society and to testify concerning a number of factors which might result in a misidentification.
[[Image here]]
After a hearing, the district court granted the government’s motion to exclude Dr. Neuschatz’s testimony on the grounds that it would not assist the jury. The court also explained that the testimony was not admissible under Fed. R. Evid. 403_ Thus, the danger of unfair prejudice, confusing of the issues or *327 misleading the jury heavily outweighed the probative value of the testimony.
Id. The trial court in today’s case specifically found the dangers of confusion and misleading the jury to be problematic while exercising the discretion that only a trial judge can employ. The Fourth Circuit agreed that the district court did not abuse its discretion in determining that the “proffered evidence was not ‘scientific knowledge’ that would be of benefit to the jury.” Id.
¶ 142. More recently, a U.S. district court in Minnesota was the latest court to exclude Neuschatz’s testimony, finding:
because expert evidence can be both powerful and quite misleading, a trial court must take special care to weigh the risk of unfair prejudice against the probative value of the evidence under Fed. R. Evid. 403. It is plain error to admit testimony that is a thinly veiled comment on a witness’s credibility.
United States v. Benedict, 2013 WL 6500120, *3 (D.Minn. Dec. 11, 2013) (quoting Nichols v. American Nat’l Ins. Co., 154 F.3d 875, 884 (8th Cir.1998)) (emphasis added). The Benedict court held that “[bjecause Dr. Neuschatz’s proposed testimony would address issues of witness credibility, his testimony will not be admitted.” The same court reaffirmed its decision and stated “the subject of Dr. Neuschatz’s proposed testimony would improperly invade the province of the jury.” United States v. Benedict, 2014 WL 272317 (D.Minn. Jan. 24, 2014).
B. Our standard of review is no different.
¶ 143. In the case sub judice, the trial judge heard a proffer of Neuschatz’s testimony outside the presence of the jury in order to determine its admissibility. The trial judge, as have most courts that have addressed this issue, excluded the proffered testimony under Rule 403 as not likely to assist the jury and likely to confuse the jury due to the abundance of other direct and circumstantial corroborative evidence, including Tonya’s uncontested eyewitness testimony, Corrothers’s confession heard by two witnesses, and a videotape displaying Corrothers’s likeness.
¶ 144. “Our well-settled standard of review for the admission or suppression of evidence is abuse of discretion.” Mississippi Transp. Comm’n v. McLemore, 863 So.2d 31, 34 (Miss.2003) (citing Haggerty v. Foster, 838 So.2d 948, 958 (Miss.2002)). “[Tjhe admission of expert testimony is within the sound discretion of the trial judge.” McLemore, 863 So.2d at 34. “Sound discretion imports a decision by reference to legally valid standards.” Bell v. City of Bay St. Louis, 467 So.2d 657, 661 (Miss.1985). “Where a trial judge in determining a matter committed to his sound discretion makes his decision by reference to an erroneous view of the law, this Court has authority to take appropriate corrective action on appeal.” Id. That did not occur in this case. The decision of a trial judge to exclude expert testimony “will stand ‘unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion.’” McLemore, 863 So.2d at 34 (citing Puckett v. State, 737 So.2d 322, 342 (Miss.1999)). Certainly, the trial judge did not “flunk the test.” Nothing in the record hints of an arbitrary decision. The trial judge thoughtfully considered and reconsidered his decision. This discretion has been described as follows:
Our inquiry, then is not whether the circuit judge ruled contrary to what one of us might have ruled, not whether he was ‘right’ or ‘wrong’ in our view, but whether he abused his discretion. And, unless the trial court based his decision on an erroneous view of the law, we are *328 not authorized to reverse for an abuse of discretion unless we find it was arbitrary and clearly erroneous.
Westbrook v. State, 658 So.2d 847, 851 (Miss.1995) (quoting Hooten v. State, 492 So.2d 948, 950 (Miss.1986)) (emphasis added). Stated differently, if reasonable minds could differ on whether an expert’s proffered testimony should be considered by the jury vel non, the trial court’s decision cannot amount to an abuse of discretion as a matter of law. See Westbrook, 658 So.2d at 851.
¶ 145. In the case sub judice, the trial court did not exclude the proffer for lack of general acceptance; he excluded it because it did not “fit” the facts of the case and, thus, would confuse the jury. See Daubert, 509 U.S. at 591, 113 S.Ct. 2786. The dissent authored by Justice Coleman states that “the trial court erred by not applying the Daubert factors in its determination of the admissibility of Neus-chatz’s testimony.” (Coleman Dis. Op. ¶ 219). However, the trial court may reject expert eyewitness testimony solely on the grounds that it is irrelevant or unfairly prejudicial under Rule 408. U.S. v. Curry, 977 F.2d 1042 (7th Cir.1992) (“[w]e conclude, however, that the district court’s decision to exclude [expert eyewitness testimony] was a proper exercise of its discretion, whether under Rule 702 or Rule 403”). In fact, most courts that have excluded expert eyewitness testimony have excluded such testimony based on Rule 403 grounds, not based on a full Daubert analysis. Regardless, had the trial court applied a Rule 702 Daubert analysis, exclusion would still be the result, for the proffer did not “fit” the facts. The dissent opines that every defendant has “a ‘fundament right’ to present his theory of the case.” (Coleman Dis. Op. ¶ 220). The “fundamental right” to assert a defense is not boundless. Admission of testimony is controlled by and subject to the Mississippi Rules of Evidence. The Rules of Evidence preclude the admission of evidence that is irrelevant, confusing, substantially more prejudicial than probative, inter alia. The Rules of Evidence permit the exclusion of expert testimony that does not meet the two prongs, relevance and reliability, of McLemore and Daubert. Neus-chatz’s testimony was not relevant because it did not “fit” the facts and was confusing, as found by the trial judge. Furthermore, its reliability is debatable, as acknowledged by self-identified experts in the very same field.
¶ 146. Additionally, a trial judge cannot be held in error for evidence not presented to him. See Moffett v. State, 49 So.3d 1073, 1114 (Miss.2010) (“[w]e will not hold a trial court in error for issues not presented to it for ruling”). The proponent of expert testimony has the burden of establishing the admissibility of such testimony. Neuschatz failed to offer any studies, articles, surveys, or other documentation to establish the admissibility and “scientific validity” (a precondition to admission) to support the ipse dixit of his testimony. See McLemore, 863 So.2d at 36. Rather, Neuschatz offered only a mischaracterization of a 2001 survey (see infra). That should be the end of this discussion. However, Corrothers, on appeal, offers numerous articles and surveys not provided to the trial court to convince this Court of the propriety of generalized expert-identification testimony.
C. Neuschatz’s proffered propositions are neither generally accepted nor reliable.
¶ 147. The Kassin article referred to by Neuschatz at trial and the Mississippi Psychological Association in its amicus brief reveal the opposite. Support for expert eyewitness-identification testimony has actually declined among psychologists.
*329 Neuschatz proffered that, based on a general-acceptance survey conducted by “Sal Kasten [sic] [referring to Saul Kassin],” the theories he proffered were “generally accepted and for the most part almost all of them between 70 to 100 percent agree that they have been accepted.” The survey cited paints a different picture. In 2001, Dr. Saul Kassin conducted a survey of self-described experts on the “general acceptance” of eyewitness-testimony research.[8] The survey updated a previous survey of 1989 conducted by Kassin.[9] Significantly, the 2001 article concluded that the consensus among the participants was that the reliability of numerous propositions had declined since the 1989 survey. The 1989 survey included twenty-one propositions. The 2001 survey included thirty. Propositions that declined in reliability, for which Neuschatz proffered an opinion, included the effects of (1) stress, (2) exposure time, (8) lineup fairness, and (4) unconscious transference upon eyewitnesses. Twelve years of additional research in the theoretical field of witness identification reflect many of the same shortcomings that enlightened courts across the country recognized.
¶ 148. The 2001 article reveals that only six percent of the sixty-two self-reporting experts worldwide[10] believed the experimental studies on the effects of “stress” were “very reliable,” and only thirty-one percent considered “stress” to be “generally reliable.”[11] Only twenty-four percent believed the theory of “weapon focus” was “very reliable.” Only thirty-five percent considered the “unconscious transference” theory to be “very reliable.” Only forty percent found “cross-race bias” to be “very reliable.”[12]
¶ 149. The lack of general acceptance and reliability fails McLemore. In the case sub judice, not a single factor proffered by Neuschatz as “affecting” Josh Clark’s eyewitness identification received higher than a forty-percent approval rating as better than simply “generally reliable.” Neuschatz failed to provide the trial judge a copy of the 2001 article that he cited as authority for his testimony, despite the burden of establishing the admissibility of such testimony. As part of a trial court’s “gatekeeping responsibility,” the “trial court must make a ‘preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid.’” McLemore, 863 So.2d at 36 (emphasis added). Neus-chatz’s proffer failed to satisfy a modified Daubert standard, Kumho Tires,[13] and more importantly, McLemore. Whether six percent or forty percent of the experts in this limited field can agree that such testimony is “very reliable,” neither percentage qualifies as a consensus of opinion, or the seventy-to-one-hundred-percent general acceptance testified to by Neus-chatz. Neuschatz’s testimony that the field was generally accepted was belied by the very article he referenced and Cor-rothers’s brief relies upon to support admissibility. I acknowledge that the article *330 discussed swpra was not presented to the trial court, but it was referenced by Neus-chatz as the underlying basis for his opinion. No other articles were offered to support Neuschatz’s ipse dixit. We have instructed our trial courts not to accept unsupported statements, i.e., ipse dixit, of proposed experts. McLemore, 863 So.2d at 37 (courts “should not ‘admit opinion evidence that is connected to existing data only by the ipse dixit of the expert,’ as self-proclaimed accuracy by an expert [is] an insufficient measure of reliability”).
¶ 150. Our rules do not allow for expert evidence that is not reliable and not scientifically valid. McLemore, 863 So.2d at 36. The courts cited by Corrothers that have accepted such testimony failed to address decline in acceptance, and more importantly, did not discuss any distinctions of the scientific validity of opinion testimony on “soft science”[14] versus “hard science,” where near, if not absolute, certainty exists (e.g., a consensus exists that one molecule of water is made up of two atoms of hydrogen and one atom of oxygen).
D. Neuschatz’s proffer did not fit the facts of the case, obviating the need for his testimony.
¶ 151. Daubert requires the facts to fit the case. The State presented compelling evidence, direct and circumstantial, corroborated by another uncontested eyewitness, Tonya, a video, and a confession, beyond the testimony of Josh Clark (the target of Neuschatz’s proffer), obviating the need for Neuschatz’s testimony.
¶ 152. This is not a one-eyewitness, drive-by shooting case.[15] Of great import within the context of this case, the State presented evidence of Corrothers’s confession through two separate witnesses, Tiffany Hutchins and Frederick Holmes. A defendant’s “confession is probably the most probative and damaging evidence that can be admitted against him.” Palm v. State, 748 So.2d 135, 143 (Miss.1999) (quoting Arizona v. Fulminante, 499 U.S. 279, 295-96, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991) (White, J., dissenting)). Hutch-ins was a lifelong friend of Corrothers, hanging out with him every weekend. Hutchins testified that, two days after the murders of Frank and Taylor Clark, Cor-rothers came to Hutchins’s mother’s residence to see her boyfriend, Holmes. She overheard Corrothers telling Holmes that he had “killed some people.” She asked Holmes “did Corrothers say what I think he said?” Holmes confirmed he had. She demanded that Corrothers leave immediately. Holmes testified that Corrothers told him that he had “killed these white folks.” Holmes then testified that Cor-rothers had recounted the story of how he killed Frank and Taylor. Holmes’s testimony corroborated the facts already in evidence.
¶ 153. In addition to Tonya’s eyewitness testimony and Corrothers’s confession, the State presented numerous witnesses who provided direct and circumstantial evidence that corroborated Corrothers’s confession and guilt. See Fulminante, 499 U.S. at 299, 111 S.Ct. *331 1246 (“details in the confession ... were corroborated by circumstantial evidence”)- Less than an hour before the murders, Karen Hickinbottom observed Corrothers in the company of Taylor Clark. First, Karen saw Cor-rothers after her daughter Jasmine opened the front door, revealing Cor-rothers standing in her doorway, wanting to speak to Taylor. Then, Karen saw Corrothers and Taylor walk to Taylor’s car and get in and drive off. Karen later identified Corrothers from a photo lineup. At trial, Karen again identified Corrothers as the man at her house shortly before the murders of Taylor and Frank Clark.
¶ 154. Shortly after Corrothers and Taylor left in Taylor’s car, Josh and Tonya saw Corrothers outside and inside their home preceding, during, and after the murders of Taylor and his dad, Frank. The event began shortly after Tonya and Frank retired to bed at approximately 10:30 p.m., the approximate time Taylor and Corrothers pulled away from Karen’s house. Tonya heard Taylor yelling a man was “fixing to kill Josh.” Then Tonya witnessed her husband desperately attempt to keep an intruder from entering their home. Frank and Taylor sought to block the intruder’s entry as Tonya watched from inside their house and Josh watched from outside. The intruder succeeded in opening the door sufficiently to get his revolver around the door and blindly shot Frank. After Frank succumbed to the fatal gunshot wound, Tonya testified that Corrothers entered their home, standing directly in front of her demanding “dope or money.”[16] When she did not immediately appease Corrothers’s demand, Corrothers shot her in the neck. Tonya then watched as Taylor charged Corroth-ers and wrestled with Corrothers, just a few feet away in the living room. She watched as Corrothers continued his unmerciful assault, shooting and killing her son, Taylor. Tonya watched Corrothers head to her bedroom and then re-enter the living room, after rummaging through her bedroom, this time with her husband’s rifle. Corrothers approached her again, standing directly over her with the rifle and threatening to shoot her again. Tonya had the presence of mind to know the gun was not loaded, as her husband did not keep his guns loaded. She felt Corroth-ers’s threat was idle. Tonya watched as Corrothers realized that the gun was not loaded, discarding it, but not before taking the time to wipe the rifle clean, to destroy potential incriminating forensic evidence.[17]
¶ 155. Tonya then watched Corrothers approach her other son, Josh, who by then was inside the house. She then intervened to protect Josh. She forced herself physically between Corrothers and Josh, providing yet another up-close and personal look at Corrothers. She then had the presence of mind to offer Corrothers whatever money she had and a spare key to Taylor’s car, in the hope that Corrothers would leave. She then located the cash and the spare key from her purse. She pleaded with Corrothers face-to-face to leave her home. She asked Corrothers “why?” Corrothers responded to her inquiry. He told her Taylor owed him money. Corrothers then moved toward the door and out of the house. Tonya followed Corrothers. She watched Corrothers go to the wrong car. She spoke to him again, directing him to the correct car. Finally, she saw him drive away, albeit the wrong way, on a *332 dead-end road which ends at a wooded area.[18] Josh provided similarly detailed testimony on his countless opportunities to observe Corrothers over countless minutes, from some of the same, and some different, vantage points. In sum, Tonya and Josh had countless opportunities, over countless minutes, to observe Corrothers over the course of his killing spree.
¶ 156. It was in Grand Oaks that Taylor Windham, in the early morning hours, witnessed a black male, not wearing a shirt, with scratches on his upper body, and wearing baggy pants, and otherwise corroborating the description of the suspect given by the victims, wandering around the Grand Oaks neighborhood on foot, miles from Oxford. The man told Wind-ham he had been “jumped.” The man was walking away from Highway 7. Windham gave him directions to Highway 7. Within minutes, Kevin Maxey, working at a nearby convenience store, gave corroborating testimony that a black male matching the same description (not wearing a shirt, with scratches, and wearing baggy pants) came into the store. The man told him a story of being “jumped.” The man made two phone calls, without conversing. He then purchased goods with cash. The store’s video surveillance captured Corrothers in baggy pants, no shirt, and otherwise matching the description given by the Clarks to police. The store video and still photos were exhibited to the jury. All of these corroborating events transpired during the same time frame that Corrothers told the police he was home in bed. Cor-rothers said he would not be seen on the video, nor was he seen in Grand Oaks. (See Maj. Op. ¶ 13). Lest we forget, the jury had three days to compare Corrothers to the man in the video.
¶ 157. In short, the testimony which resulted in Corrothers’s convictions, in addition to Josh’s eyewitness testimony, was corroborated by Corrothers’s confession to two people (one a lifetime friend of Cor-rothers), direct eyewitness testimony from Tonya, circumstantial testimony from multiple disinterested witnesses, direct corroborating evidence provided by the video surveillance tape, and the police officer’s testimony that Corrothers’s alibi claims did not check out. The State provided abundant direct and corroborative evidence beyond the testimony of Josh Clark of the crimes which occurred that fatal night, providing the jury ample evidence to establish Corrothers’s guilt beyond a reasonable doubt.

1. Neuschatz’s testimony is problematic.

¶ 158. Neuschatz’s proffer in this case is problematic. Parts of his proffer were based on a lack of facts; others were based on lack of knowledge of other evidence admitted. Finally, he proffered opinions assuming scenarios in direct contradiction to the facts developed at trial. Such a proffer fails both the relevance[19] and reliability prongs of Rule 702. See McLemore, 863 So.2d at 38. Neuschatz opined that multiple factors “could have” affected the accuracy of Josh’s identification of Corrothers — high stress, weapons focus, unconscious transference (the bystander proposition), cross-race identification, exposure time, lighting, and prior injury. Neuschatz also admitted that eyewitness identification is not the main fo *333 cus of his studies. I respectfully differ with Justice Coleman in his conclusion that Neuschatz has “performed specific studies in the field of eyewitness identification.” (Coleman Dis. Op. ¶ 218). The only study Neuschatz described in his testimony was not a study on eyewitness identification, but a study on photo-lineup memory, which involved lineup identifications, not eyewitness identifications.[20]

a.Factual inconsistencies with Neuschatz’s proffer

¶ 159. Neuchatz’s proffer was riddled with factual inconsistencies and unsupported assumptions. He proffered that, although “I have done no research on [brain injuries],” Josh’s injuries may have affected his identification of Corrothers. He further proffered that Josh’s short exposure to the crime and lack of light could or may have affected his identification. The exact length of Corrothers’s crime spree is unknown, and poor lighting conditions were never established by Corrothers. Contrastingly, Josh testified that all the lights were on, and that he had multiple looks at Corrothers over an extended period of time. Neuschatz further sought to undermine Josh’s identification by opining Josh could or may have focused on the gun and not Corrothers. But Josh testified that he had several looks at Corroth-ers, and the gun was directed at him only once over the entire spree.

b.Neuschatz’s proffer is not based on any degree of reasonable certainty.

¶ 160. Neuschatz chose his words carefully, repeatedly using “may” or “could,” and “in general.” Neuschatz’s use of “could” and “may” — an auxiliary verb used to express mere possibility — hardly constitutes a quantifiable, verifiable truth that would assist the jury. We do not allow drug analysts to testify that the leafy, green substance “may” or “could” be marijuana, or the white powder “may” or “could” be cocaine. Instead, experts in their respective fields are required to conduct standard tests, follow accepted protocols, and, if convinced, then state with a reasonable degree of scientific certainty that the substance tested is one or the other. Further, Neuschatz repeatedly opined that certain factors could or may have affected Josh’s memory, yet he offered no quantification of how, or to what extent, the factors did influence his identification.

c.Neuschatz’s unconscious transference theory lacks factual relevance.

¶ 161. Neuschatz’s bystander/transference theory lacks relevance and a factual basis, as there were no other persons from whom Josh could have unconsciously transferred identification. Josh testified that he had never seen Corrothers before. Yet Neuschatz proffered that Josh had testified that he had seen Corrothers before, which may have led Josh to identify Corrothers as the culprit. Tonya and Josh saw only one person, the perpetrator, at the scene of the murders. Moreover, Taylor Windham described seeing only one person. Maxey’s testimony and the convenience-store video verify the same description. No testimony provided any *334 factual basis to opine that any witness unconsciously, mistakenly identified Corroth-ers, for no bystanders were present at any pertinent time.
¶ 162. Not only is Neuschatz’s unconscious-transference theory not relevant in the case sub judice, his proffer, based on the article, was flawed. Appendix B, attached to the amicus brief, is Neuschatz’s “Report on Eyewitness Identification” in State v. Caleb Corrothers. In it, Neus-chatz cites a 1994 article on unconscious transference as a basis of his opinion, which he calls “the most comprehensive set of studies on unconscious transference to date.” Tellingly, the same article describes its own limitations, including “limited external validity” and “limited general-izability,” and characterizes the proposition as “a theoretical notion,” which “need[s] modification and further development,” which was “proposed” in the study only to “encourag[e] research in this area,” and “not [to] provid[e] the definitive word” on the topic, quite a sharp contrast to Neus-chatz’s characterization. The Sixth Circuit in United States v. Langan addressed the 1994 article and pointed out that the article’s author conceded that the “literature provides mixed and somewhat weak support ... [and] the empirical evidence for the theory’s existence is rather meager,” [21] hardly a ringing endorsement of a general consensus of reliability. The Sixth Circuit upheld the exclusion of unconscious-transference testimony on the grounds that it was not sufficiently based on “scientific knowledge.” I am persuaded this Court should do likewise.

d. Neuschatz’s cross-race-bias proffer is fatally flawed.

¶ 163. As noted by Justice Chandler, no witnesses testified as to the amount of time they had spent in the company of African Americans, the number of African-American friends they had, or the integration of African Americans in their lives, families and communities. Thus, Neus-chatz’s assumption that Josh’s identification could or may have been affected by cross-race identification is an underlying assumption without factual support and is not based on facts adduced in this case.
¶ 164. Neuschatz’s exposition offered an intriguing but dubitable statement. After opining that “each race has different facial features,” he proffered “I don’t know that [it] is common knowledge that each race has different facial features.” This is a fact presumably not known to the judge, witnesses, and jury. Other propositions supposedly unknown to common folks (nonexperts) like us, or those who serve on juries, are that “the less time an eyewitness has to observe an event, the less well he or she will remember it,” “alcoholic intoxication impairs an eyewitness’s recall,” “young children are less accurate than adults,” and “young children are more vulnerable to suggestion and peer pressure.”[22]
E. Trial Court Analysis
¶ 165. All of the foregoing evidence had been presented before the trial judge considered the admissibility of Neuschatz’s proffer. The trial court astutely noted there was substantial corroborative evidence, including eyewitness testimony, in addition to Josh’s testimony. Unquestionably, the trial judge is in a superior position to evaluate testimony and determine whether Neuschatz’s proffer would assist *335 or mislead and confuse the jury. The learned trial judge ruled:
the court is in a position to apply [Neus-chatz’s] proposed testimony to the facts as the court has found them in evidence. In this case there is ... obviously two eye witnesses and a fair amount of circumstantial evidence that has come in this case combined. It is not a one witness, one eye witness case. There is direct and circumstantial evidence.... [T]here has been a fairly vigorous robust opportunity by defense counsel to question the perception of Josh Clark without the aid or assistance of an expert. ... [I]n this case under these facts that these lay people witnesses have had as good an opportunity to make their own conclusions, draw their own conclusions about memory and perceptions in this case. The risk of confusion I believe is very high in this case as opposed to the opportunity for anything that might aid in the trier of fact. In this case the proof is clear that these two eye witnesses had a fairly lengthy period of time to observe the defendant ... and specifically under these facts of this case the court finds that this particular expert testimony will not assist the trier of fact to understand the evidence or to determine any facts in issue in this case.
(Emphasis added.) Neuschatz’s proffer Josh offered no aid or assistance to the triers of fact about other eyewitness testimony (that of Tonya, Karen, Windham, and Maxey) and failed to address or acknowledge the damning testimony of Holmes and Hutchins, or other corroborative evidence, including the store videotape. The trial court ruled “the risk of confusion is very high.” I agree. Neus-chatz “flunked the test.” Neuschatz’s proffer relied on faux testimony, in direct contradiction to the eyewitnesses (lighting conditions, short duration, inter alia).
F. The majority of courts reject expert eyewitness-identification testimony in cases with corroborative evidence.
¶ 166. Before this court requires our trial courts to admit such testimony, as advocated by the Coleman dissent, we should examine how courts across the country treat the topic. Most find it to be of dubious value, with only a distinct minority holding the opposite viewpoint.[23] A majority of courts have upheld the exclusion of similar testimony in cases factually akin to the case sub judice. The learned trial court’s decision to exclude Neus-chatz’s proffer on eyewitness identification is in accord with courts across our nation, state and federal, that will permit this type of testimony, but only in limited circumstances, none of which are present in today’s case.
¶ 167. In general, expert eyewitness-identification testimony is rife with potential hazards. “Outside of ... narrowly constrained circumstances, jurors using common sense and their faculties of observation can judge the credibility of an eyewitness identification, especially since deficiencies or inconsistencies in an eyewitness’s testimony can be brought out with skillful cross-examination.” United *336 States v. Harris, 995 F.2d 532, 535 (4th Cir.1993) (upholding the exclusion of expert eyewitness-identification testimony). Twelve jurors — using their collective common sense and life experiences and applying reasonable inferences — are best equipped to determine the credibility, veracity, and ultimately the reliability of an eyewitness’s identification of the defendant. Generalized expert testimony based on surveys with controlled factors, unlike actual crime-scene conditions, should not be allowed to encroach upon the common sense, knowledge and experience, inter alia, of a jury. See United States v. Brown, 540 F.2d 1048, 1054 (10th Cir.1976) (“Generally, expert testimony ... cannot invade the field of common knowledge, experience and education of men.”). “Such expert testimony will not aid the jury because it addresses an issue of which the jury already generally is aware, and it will not contribute to their understanding of the particular dispute.”[24] United States v. Hudson, 884 F.2d 1016, 1024 (7th Cir.1989) (rejecting the use of expert eyewitness-identification testimony). “The general reliability of eyewitness identification is a matter of common understanding.” United States v. Martin, 391 F.3d 949, 954 (8th Cir.2004). As one court described, Daubert’s “ ‘helpfulness’ standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.” Perry v. Novartis Pharm. Corp., 564 F.Supp.2d 452, 459 (E.D.Pa.2008) (quoting Daubert, 509 U.S. at 591-92, 113 S.Ct. 2786). This helpfulness requirement ... is, in the end, “the ultimate touchstone of admissibility.” Perry, 564 F.Supp.2d at 459 (citation omitted).
¶ 168. In commenting on the “controversial subject” of expert eyewitness-identification testimony, the Sixth Circuit espoused the following concerns, shared by most courts across the county:
Trial courts have traditionally hesitated to admit expert testimony purporting to identify flaws in eyewitness identification. Among the reasons given to exclude such testimony are [1] that the jury can decide the credibility issues itself, [2] that experts in this area are not much help and largely offer rather obvious generalities, [3] that trials would be prolonged by a battle of experts, and [4] that such testimony creates undue opportunity for confusing and misleading the jury.
United States v. Langan, 263 F.3d 613, 621 (6th Cir.2001) (upholding the exclusion of expert eyewitness-identification testimony) (internal citations omitted). The Sixth Circuit further emphasized the concern that the testimony “would not have been based on any personal knowledge of [the witness], but rather on his general knowledge about the type of circumstances in which she had found herself,” ultimately concluding that “the hazards of eyewitness identification are within the ordinary knowledge of most lay jurors.” Id. at 623-24.
¶ 169. The Second Circuit addressed the lack of scientific certainty associated with such testimony and held:
The expert here was ignorant of the conditions under which Castellón identified Cinnante’s photograph and his proposed testimony basically consisted of general pronouncements about the lack of reliability of eyewitness identification, particularly cross-racial identifica *337 tion. He also acknowledged that many of his conclusions coincided with common sense.... [W]e do not think that this expert’s proffered testimony would have done anything other than to muddy the waters.
United States v. Serna, 799 F.2d 842, 850 (2d Cir.1986), abrogated on other grounds by United States v. DiNapoli, 8 F.3d 909 (2d Cir.1993) (upholding the exclusion of expert eyewitness-identification testimony) (emphasis added).
¶ 170. The Eighth Circuit has time and again stated that we are “especially hesitant to find an abuse of discretion [in denying expert eyewitness-identification testimony] unless the government’s case against the defendant rested exclusively on uncorroborated eyewitness testimony.” United States v. Villiard, 186 F.3d 893, 895 (8th Cir.1999) (citing United States v. Kime, 99 F.3d 870, 885 (8th Cir.1996) (quoting United States v. Blade, 811 F.2d 461, 465 (8th Cir.1987))). As discussed supra, there is not only additional eyewitness testimony, there is substantial corroborative evidence in the case sub judice.
¶ 171. The Ninth Circuit also has found such “general” testimony unreliable. United States v. Poole, 794 F.2d 462, 468 (9th Cir.1986) (affirming the exclusion of expert eyewitness-identification testimony on the grounds that “the court believed that general testimony, not tied to the specific testimony in the case, would not be helpful to the jury”). Such generalized testimony, without more, fails to satisfy our admissibility standards.
¶ 172. The Supreme Court of Louisiana has ruled such testimony per se inadmissible.[25] State v. Young, 35 So.3d 1042, 1050 (La.2010). In Young, a gunman attempted to rob two victims while they were pumping gas. The gunman shot and killed one victim and injured the other. A woman sitting in a nearby car witnessed the attempted robbery and shootings. She described the man to police and later picked the defendant out of a lineup. The trial court allowed the defense to introduce an expert in eyewitness identification. The Louisiana Supreme Court reversed- and held that allowing the eyewitness-identification expert to testify was error. The court held that “[t]here is still a compelling concern that a potentially persuasive expert testifying as to the generalities of the inaccuracies and unreliability of eyewitness observations, that are already within a juror’s common knowledge and experience, will greatly influence the jury more than the evidence presented at trial.” Id. “By merely being labeled as a specialist in eyewitness identifications, an expert has the broad ability to mislead a jury through the ‘education’ process into believing a certain factor in an eyewitness identification makes that identification less reliable than it truly is.” Id. The court further held:
Moreover, expert testimony on eyewitness identifications can be more prejudicial than probative because it focuses on the things that produce error without reference to those factors that improve the accuracy of identifications. The expert testimony presumes a misidentification, in the absence of presenting factors which support the validity of the identification. This fosters a disbelief of eyewitnesses by jurors.
Id. Additionally, the court ruled that it was “reluctant to allow experts to offer opinions on the credibility of another witness for fear of the expert invading what is considered the exclusive province of the *338 jury.” Id. Finally, the court stated “[tjhese considerations are especially compelling in cases involving eyewitness identifications where any alleged deficiencies could easily be highlighted through effective cross-examination and artfully crafted jury instructions.” Id.
¶ 173. The Pennsylvania Supreme Court likewise affirmed the exclusion of expert eyewitness-identification testimony, holding that “[s]uch testimony would have given an unwarranted appearance of authority as to the subject of credibility, a subject which an ordinary juror can assess.” Commonwealth v. Simmons, 541 Pa. 211, 662 A.2d 621, 631 (1995).
¶ 174. The Tenth Circuit has held that generalized testimony on eyewitness identification would not assist the jury. United States v. Rodriguez-Felix, 450 F.3d 1117,1125 (10th Cir.2006) (“expert psychological testimony is unlikely to assist the jury”).
¶ 175. We have surely held no different. Expert testimony on eyewitness identification improperly invades the province of the jury. See Hobgood v. State, 926 So.2d 847 (Miss.2006) (holding that an expert’s comment on a witness’s credibility “is at best of dubious competency”). The jury is the sole judge of the weight of the evidence and the credibility of witnesses. Bateman v. State, 125 So.3d 616, 624 (Miss.2013).
¶ 176. United States v. Moore and State v. Copeland, relied upon by the Coleman dissent, are clearly distinguishable. Moore actually upheld the exclusion of this kind of testimony. United States v. Moore, 786 F.2d 1308, 1312 (5th Cir.1986) (“in the present case we do not find that the district court abused its discretion in refusing to admit this evidence”). In Moore, the witness based her identification on having seen the defendant for only five to six seconds. Moore, 786 F.2d at 1311. Even so, the district court excluded the testimony, stating that the “probativeness of eyewitness testimony was not a matter which needed evaluation by experts.” Id. The Fifth Circuit affirmed the district court’s exclusion, stating “[w]e have found no federal cases which hold that a trial court abused its discretion by excluding expert eyewitness-identification testimony,” and “there is no federal authority for the proposition that such testimony must be admitted.” Id. at 1312-1313 (emphasis original). While the Copeland court held that the trial court erred in refusing to admit expert eyewitness-identification testimony, it emphasized that eyewitness testimony was the only link to the defendant’s participation in the murder. State v. Copeland, 226 S.W.3d 287, 303 (Tenn.2007). Moreover, the eyewitness testified that she saw the defendant for only “two full seconds.” Id. at 291. The case sub judice is easily distinguishable, as there was more than one eyewitness and other substantial corroborating evidence, direct and circumstantial, as well as Corrothers’s confession. Moreover, Tonya and Josh had a lengthy time to observe Corrothers, not two-to-six seconds.
G. Cross-examination and jury instructions best expose flaws in eyewitness testimony.
¶ 177. Any deficiency that may exist in an eyewitness’s identification is best exposed through skillful cross-examination. As Justice Kitchens recently wrote, and the United States Supreme Court has long recognized, cross-examination is the “greatest legal engine ever invented for the discovery of truth.” Johnson v. State, 2010-CT-01978-SCT, — So.3d-, 2014 WL 971542 (Miss. Mar. 13, 2014) (quoting Lee v. Ill., 476 U.S. 530, 540, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986)); see also, 2 John H. Wigmore, A Treatise on the System of Evidence in Trials at Common Law § 1367, 1697 (1904) (“cross-examina *339 tion is our greatest invention for truth seeking.”) “[Sjkillful cross-examination provides an equally, if not more, effective tool for testing the reliability of an eyewitness at trial.” United States v. Rodriguez-Felix, 450 F.3d 1117, 1125 (10th Cir.2006) (holding that the trial court did not err in excluding expert testimony on the reliability of eyewitness identifications). “We adhere to the position that skillful cross examination of eyewitnesses, coupled with appeals to the experience and common sense of jurors, will sufficiently alert jurors to specific conditions that render a particular eyewitness identification unreliable.” United States v. Christophe, 833 F.2d 1296, 1300 (9th Cir.1987) (upholding exclusion of expert eyewitness-identification testimony). “[TJhe problems of perception and memory can be adequately addressed in cross-examination and ... the jury can adequately weigh these problems through common-sense evaluation.” United States v. Smith, 122 F.3d 1355, 1357 (11th Cir.1997) (citation omitted) (upholding the exclusion of expert eyewitness-identification testimony). In the case sub judice, Corrothers’s attorney skillfully cross-examined Josh on his identification of Corrothers. The trial court’s decision to reject Neuschatz’s testimony did not deprive Corrothers of an opportunity to present a complete defense.
¶ 178. Jury instructions further inform jurors to carefully consider the evidence and apply common sense and sound judgment to every piece of evidence, including eyewitness testimony. Expert eyewitness-identification testimony used to usurp the jury’s role and offer generalized data obtained from controlled studies, contrary to the testimony adduced at trial, should not be tolerated.
H. Neuschatz’s proffer runs afoul of the ecological fallacy.
¶ 179. One commentator has identified the “ecological fallacy” as a basis for courts rejecting expert eyewitness-identification testimony. Matthew J. Reedy, Witnessing the Witness: The Case for Exclusion of Eyewitness Expert Testimony, 86 Notre Dame L.Rev. 905, 925 (2011). The “ecological fallacy” he described is as follows:
[TJhe ecological fallacy is a statistical error of interpretation where a particular characteristic of the population as a whole is applied to an individual. Rather than providing valuable insight into the actions of an individual, “the only reasonable assumption is that an ecological correlation is almost certainly not equal to its corresponding individual correlation.”
Id. In the context of eyewitness-identification testimony, “[pjresenting testimony that humans typically have a hard time remembering faces under conditions of great stress or in the presence of a weapon tells the jury nothing about the individual case of each witness in the trial.” Id. (emphasis added). “[SJuch expert testimony runs the very real risk that juries will take that testimony to mean precisely what it does not — that the witnesses they are asked to evaluate are identically susceptible to frailties of memory.” Id. Finally, “while the expert is technically precluded from speaking directly about any particular witness, they are doing exactly that — their testimony is akin to asking the jury to consider an ecologically fallacious conclusion.” Id.
¶ 180. In the case sub judice, Neus-chatz’s use of control-group surveys to attack Josh’s credibility equates to an ecological fallacy. Neuschatz swore that eyewitness identification is not the main focus of his studies. Nevertheless, Neus-chatz attempted to pass off others’ works in the field of eyewitness identification as *340 proof of his expertise. Neuschatz testified that his survey was based on “video events” shown to a control group.[26] The control group members were not informed they had witnessed a crime on the video until after viewing it. Josh knew he was witnessing multiple crimes. The control group did not include actual victims of crimes. It is unreasonable to extrapolate the findings from a, controlled group of persons, whose life experiences are unknown, who did not witness an actual crime, were under no stress, and were not exposed to a live weapon.
¶ 181. Neuschatz’s extrapolation of statistics from his participants and applying those statistics to one individual witness (Josh) run afoul of the ecological fallacy proposition (see discussion infra). If fifty percent of the control groups misidentified the suspect, that means that fifty percent accurately identified the suspect. Neus-chatz’s proffer does not get the jury any closer to knowing into which category Josh would fall (the accurate or inaccurate category). Thus, it does not assist the jury, the trial judge, or this Court in determining whether or not Josh’s identification is reliable. As ruled by the trial judge, this is exactly the sort of jury confusion our rules of evidence seek to avoid. Compare to “[pjeople committing premeditated murders are almost twice as likely as impulsive murderers to have a history of mood disorders or psychotic disorders — 61 percent vs. 34 percent.”[27] Would we allow evidence of a defendant’s mood disorders when he was younger to show he is twice as likely to have committed the premeditated murder he is on trial for? Of course not. Such evidence runs afoul of our rules of evidence.
¶ 182. Neuschatz not only sought to encourage the jury to consider an ecologically fallacious conclusion, he proffered opinions regarding Josh’s individual memory, reliability, and identification accuracy, notwithstanding that opinions directed to an eyewitness’s reliability and accuracy are impermissible.[28]
¶ 183. In closing, as to Issue I, the few jurisdictions that admit such evidence permit it only in very narrowly defined instances, e.g., single eyewitness, with no other corroborating evidence. See United States v. Villiard, 186 F.3d 893, 895 (8th Cir.1999) (“we are especially hesitant to find an abuse of discretion in denying expert eyewitness identification testimony unless the government’s case against the defendant rested exclusively on uncorroborated eyewitness testimony”). The case sub judice is not one of these narrow cases. As such, I would affirm the discretionary decision of a learned trial judge, who passed his test. Neuschatz flunked.
II. Whether the trial court erred in neither excluding in-court identification of Corrothers nor admitting expert testimony when the evidence established that the in-court identifications were tainted by improper pre-trial identification procedures.[29]
¶ 184. Neuschatz also proffered a criticism of the photo lineups presented to *341 Josh, previously ruled admissible by the trial judge.[30] Such generalized expert testimony in limited circumstances may be pertinent at a hearing on a motion to suppress, but once the court has ruled photo-lineup evidence is admissible, offering such testimony at trial encroaches upon a legal issue already determined and usurps the trial judge’s discretionary authority. The admissibility of photo-lineup evidence, vel non, is a legal determination made by the trial judge, considering the totality of the circumstances. See Gray v. State, 728 So.2d 36, 68 (Miss.1998). In other words, prior to allowing any testimony regarding photo lineups or in-court identifications, the trial court has considered all evidence on the issue presented and determined that the photo lineup meets the proper legal threshold, or it does not. To allow a psychologist to come behind the trial judge and cast aspersions upon evidence already deemed admissible, based on the guidelines proposed by Division 41 of the American Psychological Association (also known as the American Psychological Law Society) is improper, unless we decide to turn the keys of the courthouse over to paid experts and allow them to determine the facts (jury’s role) and pronounce the law (judge’s role).
III. Whether Corrothers’s conviction must be reversed due to unconstitutional racial discrimination by the prosecution in the jury selection process and other jury selection errors by the trial court.[31]
¶ 185. The record does not reveal any evidence of the State “engag[ing] in purposeful discrimination,” a requirement for finding a Batson[32] violation. Birkhead v. State, 57 So.3d 1223, 1229 (Miss.2011) (“must make a factual finding to determine if the prosecution engaged in purposeful discrimination.”).
¶ 186. During jury selection, the State tendered twelve potential jurors, using nine strikes along the way, including five strikes against the now-complained-of persons. No claim of a pattern of purposeful discrimination was advanced at the end of the tender. Nor did the trial judge discern any pattern of purposeful discrimination in the State’s strikes. The second juror tendered by the State was an African American — Ashley Gates. Corrothers then exercised six of his strikes, leaving the State to tender six additional jurors. After the State tendered six additional jurors, Corrothers again raised no discriminatory concerns. Corrothers then struck three of the six newly tendered persons, leaving the State to tender three more jurors. The State tendered one juror, struck two with its next two strikes, leav *342 ing the State out of strikes. The Court added the next two jurors, Mildred Whitaker[33] and Michael Dewitt, to complete a twelve-person tender. Corrothers accepted Whitaker without objection, although he had strikes remaining. The State and Corrothers then selected three alternates.
¶ 187. Following juror selection, the judge discussed logistical matters related to bussing the fifteen jurors to Lafayette County and hotel accommodations. The judge was attempting to arrange the fifteen to be sent “into the grand jury room ... to give [the jury] instructions.” After the logistical discussion, Corrothers’s counsel then stated “before we go, for the record on the I guess my Batson challenges.” The trial judge stated that “the motion should be made as soon as a discriminatory pattern is detected so that the court can take control of the situation at the time ... and deal with the strikes as they occur and make whatever corrections can be made to the discriminatory pattern if there is one.... I’m handicapped now because I can’t do that.... [T]he court’s opinion is that there has not been a prima facias case made .... [b]ut I always think that it’s a good idea to invite the opponent of the motion to make their record on their reasons and I would invite and ask the State to do so at this time.”
¶ 188. The State then responded with race-neutral reasons for each person complained of by Corrothers as discriminatorily struck. We find nothing to suggest a pattern of “purposeful discrimination.” Birkhead, 57 So.3d at 1229. Carole Ray’s questionnaire supports the State’s race-neutral reason that “she did not understand some of the questions on the questionnaire.” Betty Collins’s questionnaire supports the State’s race-neutral reason of excluding her because “she disliked people who sell drugs.” (“I am against people that sell drugs and steal.”) Phyllis Berry and W.C. Brim indicated their opposition to the death penalty on their questionnaires, supporting the State’s race-neutral reason for excluding them.[34] The State struck every person, including Caucasians, who indicated an opposition to the death penalty on their questionnaires.[35]
¶ 189. No error can be attributed to the trial court on this issue, as Corrothers failed to offer any rebuttal, to any of the persons identified, other than Brim, and the rebuttal offered as to Brim was unpersuasive to the trial judge.[36] This issue has no merit, as the record evidences no pattern of purposeful discrimination. A trial judge cannot be held in error for matters not presented to him or her. Neider v. *343 Franklin, 844 So.2d 438, 436 (Miss.2003). Ultimately, the jury selected reflected the demographics of the area.[37]
PIERCE, J., JOINS THIS OPINION. LAMAR AND CHANDLER, JJ., JOIN THIS OPINION IN PART.

. The issue as presented by Corrothers (Appellant’s Brief at xii) and the State (Appellee’s Brief at 4), verbatim et literatim.

. "Fit” is “whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.” Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 591, 113 S.Ct. 2786, 2796, 125 L.Ed.2d 469 (1993) (citing U.S. v. Downing, 753 F.2d 1224, 1242 (3rd Cir.1985)).

. George Vallas, A Survey of Federal and State Standards for the Admission of Expert Testimony on the Reliability of Eyewitnesses, 39 Am. J. Crim. L. 97, 136 (2011).

. The eyewitness testimony of Tonya in the case sub judice provided a description to the responding police which matched similar corroborative descriptions by Taylor Windham and Karen Hickinbottom of Corrothers’s gender, race, height, hairstyle and pants, and the store video.

. Saul Kassin, On the "General Acceptance” of Eyewitness Testimony Research, American Psychologist 408 (2001).

. Id.

. Only fifty-three percent of the self-reporting experts were employed in the United States. The others were from the United Kingdom, Canada, Germany, Australia, the Netherlands, Spain, New Zealand, Israel, Italy, Sweden, Denmark, and France. Id.

. Id.

. Id.

. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

. “Soft science” is defined as "any of the specialized fields or disciplines, as psychology, sociology, anthropology, or political science, that interpret human behavior, institutions, society, etc., on the basis of scientific investigations for which it may be difficult to establish strictly measurable criteria.” Random House Webster’s Unabridged Dictionary 1814 (2d ed.2001) (emphasis added).

. Nor is it a one-eyewitness, two-second or five-second viewing as in State v. Copeland, 226 S.W.3d 287, 303 (Tenn.2007) (two seconds), and United States v. Moore, 786 F.2d 1308, 1312 (5th Cir.1986) (five-to-six seconds). See infra.

. Compare to the facts of Frazier, supra, "she looked him ‘right in the face’ during the incident.” Frazier, 699 S.E.2d at 749-50.

. The pistol, cartridges, and Taylor’s car were clean as well, devoid of forensic evidence.

. It was the same wooded area which abuts Grand Oaks subdivision, where a man matching Corrothers’s description was observed in the early morning hours. The two-mile heavily wooded forest sits between where Taylor’s car was found and Grand Oaks.

. Neuschatz's proffer included a telling admission, "I have no idea how other people think.”

. See Jeffrey Neuschatz, et al; "The Effects of Post-Identification Feedback and Age on Retrospective Eyewitness Memory," Applied Cognitive Psychology (2005). The study "examined the effects of post-identification feedback, age, and retention interval on participants’ memories and beliefs about memories for a videotaped event." As more fully discussed infra in the "Ecological Fallacy” section, the study consisted of Neuschatz showing college students and senior citizens a video of a crime. He would then provide false memories and false identifications to some of the participants, and see how it affected their recall of the event.

. United States v. Langan, 263 F.3d 613, 619 (6th Cir.2001).

. Saul Kassin, On the “General Acceptance” of Eyewitness Testimony Research, American Psychologist 408 (2001).

. Among the circuit courts, the Eleventh Circuit exercises a per se exclusionary rule, while the Third and Sixth Circuits favor admission. The remaining eight circuits generally defer to the district court's discretion and allow such testimony only in narrow circumstances. Lauren Tallent, Through the Lens of Federal Evidence Rule 403: An Examination of Eyewitness Identification Expert Testimony Admissibility in the Federal Circuit Courts, 68 Wash. & Lee L. Rev. 765, 786-87 (2011); George Vallas, A Survey of Federal and State Standards for the Admission of Expert Testimony on the Reliability of Eyewitnesses, 39 Am. J. Crim. L. 97, 136 (2011).

. "The advisory committee's notes [to Federal Rule of Evidence 702] make it clear that when the layman juror would be able to make a common sense determination of the issue without the technical aid of such an expert, the expert testimony should be excluded as superfluous.” United States v. Kime, 99 F.3d 870, 884 (8th Cir.1996).

. This is a state in which Neuschatz proffered he has testified. No reported cases or unreported cases exist on Westlaw that confirm Neuschatz testified in Louisiana before the blanket rule was adopted.

. The control group was composed of two distinct groups. One group consisted of sixty senior participants recruited from retirement communities with a mean age of 74.5 years. The other group consisted of sixty college students with a mean age of nineteen years.

. Robert Hanlon, Neuropsychological and Intellectual Differences Between Types of Murderers, Criminal Justice and Behavior (May 2, 2013).

. Elsewhere, he opined the opposite in his proffer.

. The issue as presented by Corrothers (Appellant's Brief at xii) and the State (Appellee’s Brief at 4), verbatim et literatim.

.Although Neuschatz asserted that "the Department of Justice has established four guidelines for compiling and administering lineups,” (Coleman Dis. Op. ¶ 230), Neus-chatz neglected to mention in his live proffer or in his report that the authority he cites as support states that the "opinions or points of view expressed in this document represent a consensus of authors and do not necessarily reflect the official position of the U.S. Department of Justice." See National Institute of Justice, Eyewitness Evidence, A Guide for Law Enforcement (October 1999) (emphasis added). Any testimony that these "guidelines” are endorsed by the Department of Justice is misleading, much as his general acceptability testimony is misleading, much as his factually contradictory testimony is misleading to the jury-

. The issue as presented by Corrothers (Appellant’s Brief at xii), verbatim et literatim.

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

.Corrothers on appeal argues that the State impermissibly struck W.C. Brim on the grounds that he had family members who had been charged with a crime, yet "allowed white female venire member Mildred Whitaker ... to be seated despite the fact that she ... [had] an uncle who had served for robbery and a cousin presently in custody.” This argument is disingenuous. The State did not choose Whitaker. The State was out of strikes when Whitaker was tendered, as evidenced by the record:
BY THE COURT: ... That means we have ten impaneled. The State is out of strikes that tenders Mildred Whitaker and Michael Dewitt to the defendant. Everybody agree? BY MRS. USSERY: Yes, Your Honor.
BY THE COURT: Whitaker 11, Dewitt 12.

. Question 29 on the Juror Information Questionnaire asked "[w]hat do you think about the death penalty?” Both Berry and Brim circled "[g]enerally [a]gainst” on Question 29.

. S4 (Rebbeca Williams), S6 (Phyllis Berry), S7 (W.C.Brim), S8 (Deidre Hereford), S9 (Lane McClellan), and Sll (Mark Williams).

. Although Corrothers offered rebuttal to the first race-neutral reason for striking Brim, Corrothers offered no rebuttal for the second race-neutral reason for striking Brim because he was "against the death penalty.”

. The jury was twenty-five percent African American. African Americans compose twenty-eight percent of the population of Lee County. http://quickfacts.census.gov/qfd/ states/28/2808l.html (last visited June 25 2014).